UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EAST VILLAGE NEW DELI CORP.,

                                          Plaintiff,

                     -v-

UNITED STATES OF AMERICA, *et al.*,

                                          Defendants.

---

20 Civ. 7356 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

The Food Nutrition Service ("FNS"), a department of the United States Department of

Agriculture ("USDA"), found that plaintiff East Village New Deli Corp ("East Village")

trafficked Supplemental Nutrition Assistance Program ("SNAP") benefits—*i.e.*, traded them for

ineligible food items or cash—and permanently disqualified it from that program.  East Village

filed this lawsuit, claiming that FNS improperly so found; violated the Administrative Procedure

Act ("APA"), 5 U.S.C. § 701 *et seq.*; and breached East Village's procedural and substantive due

process rights.  Pending now is a motion for summary judgment by the Government on behalf of

defendants the United States and Secretary of Agriculture Thomas J. Vilsack (the

"Government").  For the reasons below, the Court grants the motion in full.

I.     **Background**[1]

       A.     **Factual Background**

       FNS operates the SNAP program.  *See* Food Stamp Act of 2008, 7 U.S.C. § 2011 *et seq.*;

*see also* 7 C.F.R. § 271.3.  SNAP's purpose is "to promote the general welfare, to safeguard the

---

[1] The factual account draws from the parties' submissions in support of and in opposition to
defendants' motion for summary judgment, including defendants' Local Rule 56.1 statement,
Dkt. 35 ("Def. 56.1"), declaration of John Dotson, Dkt. 33 ("Dotson Decl."), exhibits attached to

health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011.  "SNAP beneficiaries receive a government-issued Electronic Benefits Transfer ('EBT') card and can purchase designated food items at participating firms by swiping their EBT card through an electronic reader." *Makey Deli Grocery Inc. v. United States*, 873 F. Supp. 2d 516, 517 (S.D.N.Y. 2012) (citing 7 U.S.C. § 2016(f)(3)(B); 7 C.F.R. § 274.2, 274.3).  The Government then redeems the benefits and pays the participating firm the value of the purchase.  *Id.* (citing 7 U.S.C. §§ 2013(a), 2019).

FNS is responsible for overseeing SNAP and monitoring firms to ensure compliance.  *See* 7 C.F.R. § 271.3.  Relevant here, trading SNAP benefits for cash or items other than eligible food items constitutes "trafficking."  *Id.* §§ 271.2, 278.2(a).  A participating firm found to have engaged in trafficking is permanently disqualified from SNAP.  *See id.* § 278.6(e).  However, if the firm "timely submits to FNS substantial evidence which demonstrates that the firm had established and implemented an effective compliance policy and program to prevent violations of the Program," it can, in lieu of permanent disqualification, be assessed a civil money penalty ("CMP").  *Id.* § 278.6(i).

---

plaintiff's complaint and opposition to defendants' motion for summary judgment, Dkts. 1 ("Compl."), 37 ("Employee Affidavits"), and the administrative record in this case, Dkt. 32 ("AR").  Plaintiff has not submitted its own Local Rule 56.1 response or counter-statement.

Citations to the Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in the Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.");  *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

East Village is a grocery store located at 115 Avenue A, New York, N.Y., 10009. *See* Def. 56.1 ¶ 7. In November 2018, Amran Abdo Nahshal ("Nahshal"), East Village's owner and operator, applied for authorization to redeem SNAP benefits at East Village. *Id.* ¶ 8. On November 29, 2018, in connection with Nahshal's application, a contractor for FNS visited East Village, documented the store's size and available food items, provided a layout of the public areas of the store, and took photographs of the store's inside and outside. *Id.* ¶¶ 9–10. The FNS contractor noted that East Village was approximately 900 square feet; had no shopping baskets or carts; had only one cash register; did not store food outside of public view; was "minimally stocked" and did not sell meat bundles, seafood specials, or fruit and vegetable boxes, and did not primarily sell one type of food; and that the four highest priced items were Ben & Jerry's ice cream ($6.99), cheddar cheese ($7.99 per pound), pastrami ($10.99 per pound), and roast beef ($11.99 per pound).[2] *Id.* ¶¶ 15–19. On December 3, 2018, FNS approved East Village to participate in the SNAP program and classified it as a "convenience store." *Id.* ¶ 11.

In April 2020, FNS initiated an investigation into East Village after finding that its EBT transaction data from October 2019 through March 2020 (the "Review Period") contained patterns consistent with SNAP trafficking. *Id.* ¶ 12. Due to the COVID-19 pandemic, FNS's investigation did not include a store visit (which would ordinarily occur). *Id.* ¶ 13. Instead, the investigation comprised (1) a review of the FNS contractor's notes from the November 29, 2018 in-person visit, (2) an analysis of the EBT data from East Village during the Review Period, including in the context of EBT data from other SNAP-authorized stores, and (3) an analysis of

---

[2] FNS found—and, absent factual contravention, the Court credits as true—that the SNAP-eligible foods at East Village are "generally of a low dollar value, consisting mainly of inexpensive canned and packaged goods, snack foods, single-serving food items and accessory food items." Compl., Ex. 5 at 8.

3

shopping patterns of selected households which made suspicious EBT transactions at East Village. *Id.* ¶ 13; *see also id.* ¶¶ 22–48 (detailing EBT data).

FNS's review of the EBT data during the Review Period revealed suspicious transactions of two types. First, multiple EBT transactions at East Village "were made from the account of a single SNAP household within short time frames"; FNS referred to these as "Attachment 1" transactions. *Id.* ¶¶ 21–22. For example, FNS found that one household made two transactions, one for $101.26 and the other for $89.90, in a span of less than 30 seconds, *id.* ¶ 24; another household made two transactions, one for $100.85 and the other for $84.12, in a span of 30 seconds, *id.* ¶ 25; and a third made two transactions totaling $388.21 in a less-than-five-hour period, *id.* ¶ 26. FNS identified 36 total, or 18 sets of, these Attachment 1 transactions, totaling $4,182.74 in SNAP benefits. *Id.* ¶ 23. The transactions averaged $232.37 per set of transactions and $116.19 per individual transaction. *Id.* ¶ 27; AR 107.

Second, multiple EBT transactions at East Village were "large based on the observed store characteristics and recorded food stock"; these FNS termed "Attachment 2" transactions. Def. 56.1 ¶ 29. FNS identified 140 Attachment 2 transactions, ranging from $35.00 to $202.48, and totaling $18,057.13. *Id.* ¶ 30. In comparison, FNS found that the average EBT transaction amount at a convenience store during the Review Period was $8.94 in New York County, $8.94 in New York State, and $7.63 in the United States—multiples below the average Attachment 2 transaction amount at East Village. *Id.* ¶¶ 31–32.

FNS further analyzed the shopping patterns of many of the households responsible for the suspicious EBT transactions. Many of those transactions depleted the respective households' then-current SNAP balances almost entirely. *Id.* ¶ 28. For example, one household made two purchases at East Village for $101.26 and $89.90 in less than one minute, depleting the

4

household's SNAP balance to $2.05, *id.* ¶ 45; another household made two purchases at East

Village for $100.85 and $84.12 in less than one minute, depleting the household's SNAP balance

to $1.50, *id.* ¶ 46; and a third made two purchases at East Village for $200.80 and $170.66 in less

than three hours, depleting the household's SNAP balance to less than $1, *id.* ¶ 47.

Moreover, EBT data revealed instances in which these households shopped at a "larger,

better stocked, and likely better priced" store, like a supermarket, on the same day or close in

time to making a suspicious transaction at East Village. *Id.* ¶ 44. One household noted above

engaged in suspicious transactions at East Village within less than 30 minutes of spending only

$7.98 at a nearby supermarket, *id.* ¶ 45; another did so within two hours of spending just $9 at a

grocery store, *id.* ¶ 46; and the third did so within three hours of making a $10 purchase at a

grocery store, *id.* ¶ 47. FNS found that approximately 44% of the households that conducted an

Attachment 2 transaction at East Village did so within 48 hours of making an EBT transaction at

a large grocery store, supermarket, or superstore. *Id.* ¶ 48.

FNS also considered the suspicious transactions in the context of EBT data from the 199

other SNAP-authorized stores, including 20 superstores and 12 supermarkets, within one mile of

East Village. *Id.* ¶ 33. Most notably, FNS compared East Village's EBT data to that of six

comparator stores—each a convenience store within 0.31 miles of East Village—that were not

the subject of an open SNAP compliance case during the Review Period. *Id.* ¶ 34. Compared to

those stores, East Village had a higher dollar volume of transactions ($21,599.72 at East Village;

$5,625.18 to $17,012.70 at the comparator stores) and average transaction amount ($39.34 at

East Village; $6.55 to $20.76 at the comparator stores). *Id.* ¶¶ 35, 37, 38, 40. East Village also

generated comparatively more flags in FNS's Anti-Fraud Locator Using Electronic Benefit

Retailer Transactions ("ALERT") system, which uses an investigative algorithm to identify potential suspicious transactions, of the types identified in Attachments 1 and 2. *Id.* ¶¶ 6, 36.

On May 7, 2020, FNS sent East Village a letter notifying it that FNS was charging it with trafficking, which carried the penalty of permanent disqualification from SNAP. *See id.* ¶ 50; *see also* Dotson Decl. ¶ 16; Compl., Ex. 1 ("May 7, 2020 Letter"). In the letter, FNS alleged that it had identified "[EBT] transactions that establish[ed] clear and repetitive patterns of unusual, irregular, and inexplicable activity for [East Village's] type of firm." May 7, 2020 Letter at 1; *see also* Def. 56.1 ¶ 50. FNS attached a list of the allegedly irregular charges incurred during the Review Period: (1) multiple EBT transactions from accounts of individual SNAP households within a set time period (Attachment 1); and (2) transactions that were large based on "observed store characteristics and recorded food stock" (Attachment 2). May 7, 2020 Letter at 1; *see* Def. 56.1 ¶ 51. FNS gave East Village 10 days to respond to the charges, and described the process by which East Village could request a CMP in lieu of permanent disqualification. May 7, 2020 Letter at 1–2; *see* Def. 56.1 ¶¶ 54–56.

On May 14, 2020, East Village responded by letter. Compl., Ex. 2 ("May 14, 2020 Letter"); *see* Def. 56.1 ¶ 57. In general terms, it denied having engaged in trafficking and argued that "the information (or lack thereof) presented by [FNS] [did] not support a finding of 'trafficking.'" May 14, 2020 Letter at 1; *see* Def. 56.1 ¶ 58. East Village stated that the transactions "merely illustrate[] a typical six-month period at East Village in which all EBT transactions were legal and conducted in full compliance with SNAP regulations." May 14, 2020 Letter at 1; *see* Def. 56.1 ¶ 58. Its response letter termed FNS's accusations "wholly circumstantial" and stated that the "multiple EBT transactions from the same customers occurring typically five-to-six hours apart" were "nothing more than customers returning to

make additional purchases after making their original purchase several hours earlier." May 14, 2020 Letter at 2; *see* Def. 56.1 ¶ 58. East Village attached a manual purporting to set forth its SNAP policies and procedures, along with affidavits from Nahshal and three employees attesting to their SNAP training and disclaiming engaging in trafficking.

On July 23, 2020, FNS responded by letter. Compl., Ex. 3 ("July 23, 2020 Letter"). FNS stated that it had found that the violations outlined in the May 7, 2020 Letter had occurred and that East Village would be permanently disqualified from SNAP. *Id.*; *see* Def. 56.1 ¶ 62. FNS stated that it had also found that East Village had failed to submit evidence that it had established and implemented an effective compliance policy to prevent SNAP violations and therefore was ineligible for a CMP. July 23, 2020 Letter at 1; Def. 56.1 ¶ 62.

On July 27, 2020, East Village sought administrative review of FNS's decision, reprising its arguments that there was "absolutely nothing to support" FNS's determination that it had engaged in trafficking. Compl., Ex. 4 ("July 27, 2020 Letter"); Def. 56.1 ¶ 64. East Village further argued that it had an effective compliance policy in place, as evidenced by the affidavits and SNAP manual East Village had previously submitted. July 27, 2020 Letter at 2; Def. 56.1 ¶ 64.

On September 3, 2020, FNS issued its 14-page final agency decision disqualifying East Village from the SNAP program. The agency concluded that East Village's EBT data, in conjunction with observations from the in-store visit and an analysis of customers' shopping behaviors, revealed patterns inconsistent with eligible SNAP purchases at a store of East Village's size and type. *See* Compl., Ex. 5 ("Agency Decision"); Def. 56.1 ¶ 67. Instead, FNS found, the transactions' "characteristics are indicative of illegal trafficking in program benefits." Agency Decision at 15. FNS also sustained the decision to permanently disqualify East Village

from the SNAP program, finding that East Village had fabricated the documents it submitted and failed to provide contemporary documentary evidence of employees' training. *Id.*

### B.  Procedural History

On September 9, 2020, East Village filed the Complaint, seeking *de novo* judicial review of FNS's decision to permanently ban East Village from the SNAP program. Dkt. 1. That same day, East Village filed a motion to stay the agency's decision pending resolution of this action. Dkt. 5. On October 5, 2020, the Government filed an opposition to East Village's motion. Dkt. 13. On February 12, 2021, the Court issued a decision denying East Village's application for a stay. Dkt. 20.

On March 2, 2021, the Government answered the Complaint. Dkt. 23. On April 1, 2021, the Court held an initial conference, and set a schedule for summary judgment briefing based on the administrative record. Dkt. 28. On May 19, 2021, the Government filed a motion for summary judgment. Dkt. 32. On May 28, 2021, East Village filed its opposition. Dkt. 37. On July 2, 2021, the Government filed a reply. Dkt. 38.

## II.  Legal Standards

### A.  Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

### B.    Standard of Review for Disqualification Determinations

Judicial review of an FNS decision to disqualify a SNAP firm is *de novo*. 7 U.S.C. § 2023(a)(15). The inquiry, designed to determine whether the decision is "invalid," *id.* § 2023(a)(16), involves two steps, *see Muazeb v. United States*, 17 Civ. 6754 (DF), 2019 WL 1613433, at *7 (S.D.N.Y. Mar. 28, 2019).

First, the court determines, in what the Food Stamp Act terms a "trial *de novo*," whether trafficking occurred at the firm. *Id.*; *see also Ibrahim v. United States Through Dep't of Agric.*, 834 F.2d 52, 53 (2d Cir. 1987). The firm must show by a preponderance of evidence that the agency's finding of trafficking was "invalid." *See Capellan v. United States*, No. 17 Civ. 9342 (AT), 2020 WL 1047907, at *3 (S.D.N.Y. Mar. 4, 2020); *Arias v. United States*, No. 13 Civ. 8542 (HBP), 2014 WL 5004409, at *6 (S.D.N.Y. Sept. 29, 2014) (collecting cases); *Muazeb*, 2019 WL 1613433, at *7. To meet this burden, plaintiffs must demonstrate that "*each* cited

instance of trafficking" was "invalid," because even one instance of trafficking is ground for

disqualification. *Capellan*, 2020 WL 1047907, at *3 (quoting *S.S. Grocery, Inc. v. United States*

*Dep't of Agric.*, 340 F. Supp. 3d 172, 180 (E.D.N.Y. 2018)); *see* 7 U.S.C. § 2021(b)(3)(B);

*Timsina v. United States*, 835 F. App'x 633, 636–37 (2d Cir. 2020) (summary order) ("[T]he

district court properly granted summary judgment in favor of the government because no

reasonable factfinder could conclude that the Market established that it had not engaged in any

transactions in violation of the regulations governing the SNAP program."). Notwithstanding the

statute's "use of the phrase 'trial de novo,' summary judgment is a proper method of disposing of

an action pursuant to 7 U.S.C. § 2023(a)(13) if no issues of fact are presented." *Brothers*

*Grocery & Deli Corp. v. United States*, No. 20 Civ. 6961 (JCM), 2021 WL 4443723, at *6

(S.D.N.Y. Sept. 28, 2021) (citing cases involving requests for judicial review under 7 U.S.C. §

2023(a)(13) where the material facts were undisputed and the Government was entitled to

judgment as a matter of law). In other words, "to survive summary judgment, [the plaintiff firm]

must produce evidence sufficient to show that the patterns identified by FNS fail[] to establish

that any transaction was illegitimate." *Capellan*, 2020 WL 1047907, at *4.

Second, assuming it has found that trafficking occurred, the Court determines, as a matter

of law, whether the sanction FNS has imposed was "arbitrary or capricious, *i.e.*, whether it was

unwarranted in law or without justification in fact." *Willy's Grocery v. United States*, 656 F.2d

24, 26 (2d Cir. 1981). The agency's sanction decision is accorded substantial deference. Where

"the penalty imposed is in accordance with the settled policy of the FNS, it is not arbitrary or

capricious." *Yafaie v. United States*, No. 94 Civ. 7825 (KMW), 1995 WL 422169, at *1

(S.D.N.Y. July 18, 1995); *see Willy's Grocery*, 656 F.2d at 26; *Capellan*, 2020 WL 1047907, at

*4; *Lugo v. United States*, No. 08 Civ. 2960 (RJS), 2009 WL 928136, at *3 (S.D.N.Y. Mar. 30, 2009) (collecting cases).

## III.    Discussion

### A.    The Determination That East Village Trafficked in SNAP Benefits

Measured against the above standards, summary judgment is clearly warranted for the Government because FNS's determination that East Village engaged in trafficking was supported by an overwhelming array of circumstantial evidence, and East Village's sparse rejoinders do not give rise to a disputed issue of fact.  No reasonable factfinder therefore "could conclude that [East Village] had established that it had not engaged in any transactions in violation of the regulations governing the SNAP program." *Timsina*, 835 F. App'x at 636–37.

The evidence that East Village trafficked in SNAP benefits begins with the 18 sets of Attachment 1 transactions. *See generally* AR 105–07.  These, totaling $4,182.74 in SNAP benefits, were each made by single households within short periods of time. Def. 56.1 ¶ 23.  The transactions averaged $232.37 per set, or $116.19 per individual transaction.  *Id.* ¶ 27 (citing AR 107).  And they were conducted in quick succession, often occurring in spans of less than 30 seconds. *See id.* ¶¶ 24–26.  It is not plausible that East Village could have processed such high dollar amounts' worth of eligible food items in such short spans of time.  *See Timsina v. United States*, No. 17 Civ. 126 (CR), 2019 WL 3254689, at *10 (D. Vt. July 19, 2019) (crediting argument that given the "relatively small size of [plaintiff], the presence of only one cash register, one checkout counter, one optical scanner, limited checkout counter space, no conveyor belts, and a limited stock of high value SNAP-eligible items, a store clerk could not physically process the number of items necessary and undertake the multiple steps of a SNAP redemption to achieve the total dollar amount of these purchases in the time periods recorded"), *aff'd*, 835 F. App'x 633.  That is particularly so given the undisputed fact that East Village's highest priced

11

goods hover just above $10. Def. 56.1 ¶¶ 11, 15–19. FNS's explanation for these transactions—
that East Village conducted multiple transactions within a short time period "to avoid single high
dollar transactions that cannot be supported," Dotson Decl. ¶ 17—is indicative of trafficking.
And East Village has not otherwise explained these transactions, let alone adduced evidence that
they were of a benign character.

The 140 Attachment 2 transactions—involving unusually high-dollar purchases—supply
separate circumstantial evidence of trafficking. The transactions average $128.98 and were as
high as $202.48. *See generally* AR 108–110. By comparison, the average EBT transaction
amounts during the Review Period at convenience stores in New York County and State, and the
United States, respectively, were $8.94 and $7.63. Def. 56.1 ¶¶ 31–32. FNS reasonably viewed
transactions of this size as indicative of trafficking—of misuse of SNAP funds. That is because
it would make little sense for households to spend so much money on SNAP-qualifying foods at
East Village, particularly given the store's proximity to larger, better stocked, and apparently less
expensive grocery stores, which in these ways are better suited to meet customers' high-volume
needs. *See* Agency Decision at 9; *cf. Nadia Int'l Mkt. v. United States*, No. 14 Civ. 82 (CR),
2015 WL 7854290, at *7 (D. Vt. Dec. 2, 2015) (finding transactions "excessive in light of
Plaintiff's size, inventory, and pricing" and granting summary judgment to FNS), *aff'd*, 689 F.
App'x 30 (2d Cir. 2017) (summary order); *Timsina*, 2019 WL 3254689, at *12–13 (same). And
the ready accessibility of these grocery stores was no secret to the customers at issue: 44% of
East Village's transacting customers had made SNAP transactions at such stores within 48 hours
of making an Attachment 2 transaction at East Village. Def. 56.1 ¶ 48; AR 101.

As to these transactions, too, East Village has neither articulated a plausible benign
explanation nor adduced exculpatory evidence. It counters, in a sentence, that "customers

purchase certain items by the pound" and buy "eligible items like bottled water and Red Bull energy drinks by the case," and such "types of transactions can get quite large." Dkt. 37 ("Opp'n") at 3.  But that general rejoinder, without more, does not create a material dispute of fact.  And the possibility of large-volume purchases is not logically persuasive given the small unit costs of the items sold by East Village.  A purchaser of roast beef (the store's highest priced item, at $11.99 per pound) would have to buy more than 15 pounds' worth to reach a $202.48 tab.  And, as FNS notes, such a high-volume purchase at East Village would be economically illogical with larger and less expensive grocery stores nearby.  Def 56.1 ¶¶ 11, 15–19.

In any event, had such transactions involving SNAP-eligible goods occurred, East Village's defense could readily have been vindicated by providing receipts or documentation identifying the goods comprising the large purchases.  East Village, however, did not do so, as to any transaction flagged as suspicious.  It thereby has not generated a material dispute as to *any* such transaction, let alone all.[3]  *See Timsina*, 835 F. App'x at 637 (noting that even if a store's "proffered explanations could account for some of the suspicious transactions, there still remained ample circumstantial evidence to support the inference that [the store] had trafficked").

Further circumstantial evidence of violations is supplied by the suspicious shopping patterns of various households that shopped at both East Village and nearby grocery stores.  These indicate that these households uniquely used East Village to drain their SNAP accounts, presumably because East Village permitted food stamps to be used to purchase goods that were

---

[3] Before the agency, although not on summary judgment, East Village claimed that the EBT data noted by FNS was "typical" for "a six-month period at East Village."  May 14, 2020 Letter at 1.  That fact, however, does not assist East Village, as there is no factual record establishing that the store was SNAP-compliant in other six-month periods.  In any event, as the Government notes, the record reflects that the ALERT flags generated at East Village for categories of suspicious transactions more than doubled during the Review Period in comparison with the previous six months at East Village.  Dkt. 34 at 20; AR 90–91.

not SNAP-eligible.  One household, for example, made transactions at East Village for $10 and

$101.70, then spent only $7.98 at a nearby supermarket, only to return to East Village to make an

additional $65.28 transaction (all within less than 30 minutes), depleting the household's SNAP

balance to less than $2.  Def. 56.1 ¶ 45.  The same household, on a different day, spent $101.26

and $89.90 at East Village (in a span of less than 1 minute), depleting its SNAP balance to $2.05.

*Id.*  Other households engaged in similar behavior, making high-dollar amount transactions in

quick succession at East Village that depleted their households' SNAP balances to next to

nothing.  *See, e.g., id.* ¶¶ 46 ($100.85 and $84.12 transactions at East Village in less than one

minute, hours after making a $9 purchase at a grocery store, depleting SNAP balance to under

$1.50), *id.* (same household making $190.62 transaction at East Village the same day as $2.19

purchase at a supermarket, depleting SNAP balance to $1.31), 47 ($200.80 and $170.66

transactions at East Village in less than three hours, the same day as making a $10.00 purchase at

a grocery store, depleting SNAP balance to under $1.00), *id.* (same household making $101.22

and $72.14 transactions at East Village, depleting balance to under $2.00).

     East Village does not attempt an explanation for these patterns, let alone adduce evidence

(*e.g.*, records of the items purchased) that the purchases at East Village were compliant.  *See*

*Timsina*, 835 F. App'x at 636 (flagging as "noteworthy example" a household that spent

"$159.77 at Costco, the retail warehouse giant, approximately one hour before spending $411.00

at Central Market, a store with about 1,500 square feet of shopping space, only one cash register,

one two-foot-by-three-foot checkout counter, and one optical scanner") (internal quotation marks

omitted); *Nadia Int'l Mkt.*, 689 F. App'x at 31–34 (affirming FNS's disqualification of firm

based on, among other evidence, "rapid successive purchases involving the same household" and

"relatively high-dollar transactions given [plaintiff's] size and inventory").

Also indicative of SNAP violations, East Village's EBT data yielded far more suspicious activity during the Review Period than the EBT data from comparator stores, each of which is within 0.31 miles of East Village. East Village generated significantly more SNAP redemptions than these stores, measured both by overall volume and average transaction (volume: $21,599.72 at East Village and $5,625.18 to $17,012.70 at comparator stores; average transaction amount: $39.34 at East Village and $6.55 to $20.76 at comparator stores). Def. 56.1 ¶¶ 35–40. East Village also generated significantly more ALERT flags for suspicious transactions of the types described in Attachments 1 and 2 than did the comparator stores. *Id.* ¶ 36; AR 94 (140 hits at East Village; 57, 42, 24, 17, 16, and 6 hits, respectively, at comparator stores). This data belies East Village's suggestion that its "unique location" explains its high volume of suspicious transactions. Compl. ¶ 20. As FNS rightly points out, although "a firm might have higher than average SNAP transaction amounts due to the lack of access to other SNAP authorized stores" in an area, here, there were 199 SNAP-authorized firms within approximately one mile of East Village (including 20 superstores and 12 supermarkets). AR 142. This evidence, too, supports that—unlike, or to greater a degree than, its comparators—East Village had indulged in SNAP trafficking.

East Village does not dispute the transaction data comprising this formidable body of circumstantial evidence of trafficking. Opp'n at 2. Nor does it offer evidence tending to refute this conclusion. In attempting to neutralize the Government's evidence, it instead takes two tacks, neither of which is effective.

First, East Village states that it "simply den[ies] the allegation that 'trafficking' had been occurring at the store" by submitting employee affidavits stating as much. *Id.* at 3. Such a general denial, however, does not generate a disputed issue of material fact sufficient to defeat a

motion for summary judgment. *See Hicks v. Baines*, 593 F.3d 159, 167 (2d Cir. 2010) ("[A] party cannot create a triable issue of fact merely by stating in an affidavit the very proposition they are trying to prove."); *see also Muazeb*, 2019 WL 1613433, at *11 (finding that plaintiff had engaged in SNAP trafficking where plaintiff generally asserted, without support, that "[t]hese were all legitimate transactions" but had "come forward with no evidence *whatsoever* to refute Defendants' persuasive showing of patterns of transactional activity that are indicative of trafficking in SNAP benefits") (footnote omitted) (emphasis in original); *McClain's Mkt. v. United States*, 411 F. Supp. 2d 772, 777 (N.D. Ohio 2005) (granting Government's motion for summary judgment in SNAP trafficking case where store owner's "affidavit present[ed] no explanation of any of the 149 transactions asserted against plaintiff, but merely presents general justifications for large expenditures").

Second, East Village attacks FNS's case on the ground that it is built on circumstantial evidence of SNAP trafficking. *See* Compl. ¶¶ 13, 19; Opp'n at 2–3. That argument fails. In general, and as to claims of SNAP trafficking specifically, circumstantial evidence is not of "lesser probative value than direct evidence, particularly when, as here, it is the only proof likely to be available." *Timsina*, 835 F. App'x at 637 (quoting *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989)) (citation omitted). Indeed, "Congress, through the [Food Stamps Act] and regulations promulgated by the USDA, expressly sanction[ed] reliance on 'evidence obtained through a transaction report under an [EBT] system,' to ascertain whether a firm is trafficking benefits." *Brothers Grocery & Deli Corp.*, 2021 WL 4443723, at *8 (quoting 7 U.S.C. § 2021(a)(2); 7 C.F.R. § 278.6(a)); *see also Nadia Int'l Mkt.*, 689 F. App'x at 33–34 ("[I]t was entirely proper for FNS to rely on transaction data alone in making its trafficking determination."); *Idias v. United States*, 359 F.3d 695, 698 (4th Cir. 2004) ("There can also be

little question that the United States was entitled to use this sort of documentary evidence to prove that [plaintiff] trafficked in food stamps."); *Muazeb*, 2019 WL 1613433 at *9 ("[I]t is well established that, under applicable law, the FNS may support a factual finding of trafficking with EBT transaction evidence, coupled with evidence from on-site investigations.").

In sum, far from being tenuous, the evidence adduced is formidable—and unrebutted— that East Village engaged in SNAP trafficking. "In other cases in this posture, plaintiffs have sometimes submitted evidence such as actual receipts from EBT customer transactions, showing the purchase of eligible food items with SNAP benefits, or statements or affidavits from customers or employees articulating a legitimate reason for any questionable EBT transactions." *Muazeb*, 2019 WL 1613433, at *11. East Village has not done so here, and its conclusory denials do not create a material dispute of fact. The Court accordingly enters summary judgment for the Government as to East Village's challenge to FNS's determination that East Village engaged in SNAP trafficking.

### B.    The Sanction of Permanent Disqualification

The Court turns next to whether the sanction FNS has imposed—permanent disqualification from the SNAP program—was arbitrary or capricious. *See Willy's Grocery*, 656 F.2d at 26; *El Tepeyac Grocery, Inc. v. United States*, 515 F. App'x 55, 56 (2d Cir. 2013) (summary order). East Village no longer appears to be challenging this sanction, as it did not address this point in opposing summary judgment. The Government therefore submits that East Village has waived the argument. *See* Dkt. 38 at 8–9 (citing *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, No. 14 Civ. 10116 (VSB), 2020 WL 4699043, at *4 (S.D.N.Y. Aug. 12, 2020) (citing *Triodetic Inc. v. Statue of Liberty IV, LLC*, 582 F. App'x 39, 40 (2d Cir. 2014) (summary order))). In the interest of thoroughness, the Court nonetheless resolves this question.

The decision to permanently disqualify East Village rather than impose a CMP reflected the agency's finding that East Village had failed to develop and institute an effective SNAP compliance policy in accordance with 7 C.F.R. § 278.6(i)(2).  Def. 56.1 ¶ 61; July 23, 2020 Letter at 1; Agency Decision at 13–15.  By regulation, the existence of such a policy is required for a firm to qualify for a CMP.  *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i), (i).  To qualify for a CMP, East Village needed to have submitted to FNS "substantial evidence" that it "developed and instituted an effective personnel training program as specified in § 278.6(i)(2)." 7 C.F.R. § 278.6(i).  Sub-provision 278.6(i)(2), in turn, required East Village to have "submit[ted] to FNS its dated training curricula and records of dates training sessions were conducted; a record of dates of employment of firm personnel; and contemporaneous documentation of the participation of the violating employee(s) in initial and any follow-up training held prior to the violation(s)."  *Id.* § 278.6(i)(2).  That provision also prescribes the standards by which FNS must deem a training program effective—generally, that the program be conducted timely and competently, and using authorized written materials.  *Id.* § 278.6(i)(2)(i)–(iii).

Here, East Village provided to the agency (1) an affidavit from its owner, Nahshal, stating that he had provided "regular [SNAP] training" to East Village employees since December 2018 and denying having trafficked in SNAP benefits; (2) a three-page document entitled "East Village New Deli Corp. Supplemental Nutrition Assistance Program Policy & Procedures," which include general training procedures; (3) affidavits from three employees denying trafficking; and (4) affidavits from the same employees stating that they (a) received East Village's SNAP Program Policy & Procedures manual "when the store began accepting SNAP," (b) had been "trained to the best of [Nahshal's] ability," and (c) agreed "to attend

subsequent training sessions" and "adhere to [Nahshal's] rules and regulations with regard to [SNAP]."  Dotson Decl. ¶ 21; AR 118–27.

Missing from East Village's submissions, however, were any written "dated training curricula" or "contemporaneous documentation of [employees'] participation" in SNAP training. AR 158; *see* 7 C.F.R. § 278.6(i)(2); Agency Decision at 14–15 (detailing lack of contemporary documentary evidence and calling into question authenticity of East Village's submissions). East Village thereby failed to submit the materials required to vest FNS with the discretion to impose the lesser sanction of a CMP.[4]  FNS accordingly imposed the statutorily required default punishment for SNAP traffickers: disqualification from the program.  *See* 7 U.S.C. § 2021(b)(3)(B).

Having "imposed [a penalty] in accordance with the settled policy of the FNS," the agency's decision was not "arbitrary or capricious."  *Yafaie*, 1995 WL 422169, at *1; *see also Willy's Grocery*, 656 F.2d at 26; *Capellan*, 2020 WL 1047907, at *4; *Lugo*, 2009 WL 928136, at *3 ("Courts in this District have repeatedly held that, '[i]f the agency has followed its guidelines,' 'the reviewing court may not overturn the decision as arbitrary and capricious.'") (quoting *Nagi v. United States Dep't of Agric.*, No. 96 Civ. 6034 (DC), 1997 WL 252034, at *3 (S.D.N.Y. 1997)) (collecting cases).

The Court grants the Government's motion for summary judgment on East Village's challenge to the sanction of disqualification.

---

[4] East Village also failed to provide such documentation to the Court.  On the record at hand, there is no reason to believe that such documents exist such that East Village *could* have timely provided them to the agency.

## IV.    East Village's APA Claim

In light of the above, East Village's claim under the APA is easily put down.  East Village argues that FNS failed to (1) "follow its own agency regulations in making a determination," (2) "mention any prior action taken to warn East Village about the possibility that violations were occurring," or (3) consider hardships to East Village's customers.  Compl. ¶¶ 26–27.  Such lapses, East Village claims, made FNS's decision to disqualify it from the SNAP program arbitrary and capricious, in violation of the APA.

As with East Village's challenge to the decision not to impose a CMP, East Village appears to have abandoned its APA claim on summary judgment.  In any event, this claim fails, because agency action is unreviewable under the APA where there are adequate alternatives for review in court.  And the Food Stamps Act provides the one the Court has just undertaken here on East Village's claim: *de novo* review of FNS's disqualification determinations.  *See* 7 U.S.C. § 2023(a); 5 U.S.C. § 704; *United States Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) ("[A]n agency action is reviewable under the APA only if there are no adequate alternatives to APA review in court."); *Ibrahim*, 834 F.2d at 53 ("The Food Stamp Act's de novo review provision embodies a different and broader scope of review than that available under the APA."); *Al Amin Halal Meat & Fish Mkt. v. United States*, No. 15 Civ. 276A (HBS), 2015 WL 12552019, at *15 (W.D.N.Y. Oct. 21, 2015) ("The more general Administrative Procedure Act does not override the express language of the applicable Food Stamp Act.").

The Court therefore grants the Government's motion for summary judgment on East Village's APA claim.

## V.    East Village's Due Process Claim

East Village has also abandoned its final claim: that the agency violated its rights to procedural and substantive due process by, respectively, failing to give it sufficient time to

respond to FNS's charge and imposing a sanction lacking a rational basis in law.  Compl. ¶¶ 28–34.

In any event, this claim fails substantially for the reasons set forth in the Court's earlier decision denying East Village's motion to stay.  *See* Dkt. 20.  That decision reviewed the factors relevant to whether a pre-deprivation procedure violates due process under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), and held that East Village would be unlikely to succeed on the merits of that claim.  *See* Dkt. 20 at 7–9.  As the Court explained, East Village was given multiple "opportunities to present evidence to USDA that the challenged transactions were, in fact, for eligible food items" but failed to do so, and, in any event, had the opportunity that it has availed itself of here: for *de novo* review in federal court.  *Id.* at 7–8.

East Village has not put forth any argument or evidence in support of reassessing those conclusions.  To the contrary, with the Court having now determined *de novo* on East Village's lawsuit that it engaged in SNAP trafficking, East Village has received the process it was due, and the Court has determined that agency's review process did not *erroneously* deprive East Village of its right to participate the SNAP program.

Finally, the Court rejects East Village's claims that its disqualification violated substantive due process.  As the Government notes, substantive due process "is an outer limit on the legitimacy of governmental action[] . . . violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).  Far from grossly abusing its authority, the Government's decision to disqualify from the SNAP program a trafficker like East Village comports with the "strong governmental interests in reducing food stamp abuse and in administering the program for the primary beneficiaries, namely, the SNAP recipients." *Tony's Pantry Mart Inc. v. United*

*States Dep't of Agric. Food & Nutrition Serv.*, 175 F. Supp. 3d 987, 993 (N.D. Ill. 2016).  This

Court joins the many others that have held that "prevention of illegal activity within the [SNAP]

Program is a legitimate government purpose."  *Lugo*, 2009 WL 928136 at *4; *see also, e.g.*,

*Duchimaza v. United States*, 211 F. Supp. 3d 421, 440 (D. Conn. 2016) (citing cases); *Nagi*,

1997 WL 252034, at *3.

The Court accordingly grants the Government's motion for summary judgment on East

Village's due process claims.

## CONCLUSION

For the foregoing reasons, the Court grants in full the Government's motion for summary

judgment.  The Clerk of Court is respectfully directed to terminate the motion pending at docket

32 and close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 23, 2021
      New York, New York

22